# SOUTHEASTERN CONNECTICUT REGIONAL RESOURCES RECOVERY AUTHORITY ET AL.
## *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
### (SC 15666)

Callahan, C. J., and Borden, Berdon, Norcott and Palmer, Js.

Argued January 21—officially released March 31, 1998

*Philip M. Small,* with whom were *Jeffery D. Cochran* and, on the brief, *Brian T. Henebry,* for the appellant (defendant Connecticut Light and Power Company).

*William H. Bright, Jr.,* with whom were *William H. Narwold, Roger E. Koontz* and, on the brief, *Robert E. Wright* and *Moyahoena N. Ogilvie,* for the appellees (plaintiffs).

*Opinion*

CALLAHAN, C. J. This is an appeal from a judgment of the trial court sustaining the plaintiffs'[1] appeal from a ruling by the named defendant, the department of public utility control (department), issued in response to a request for resolution of a payment dispute by the defendant Connecticut Light and Power Company, and from the department's ruling on the petition for a declaratory ruling by the plaintiffs.[2] The sole issue on appeal is whether the defendant is obligated to pay the contractually established "Average Municipal Retail Rate" for

[1] There are three plaintiffs: Southeastern Connecticut Regional Resources Recovery Authority, American Ref-Fuel Company of Southeastern Connecticut, and Air Products and Chemicals, Inc.

[2] The department is not a party to this appeal, although it was a party to the appeal to the Superior Court, which ruled contrary to its position. The office of consumer counsel and the Connecticut Resources Recovery Authority were also listed as defendants in the appeal to the Superior Court, but they are not involved in this appeal. References to the defendant are to the Connecticut Light and Power Company.

electrical output produced by the plaintiffs that is in excess of 13.85 megawatts (MW). We conclude that the defendant is so obligated.

The relevant facts are undisputed. The defendant is an electric company as defined by General Statutes § 16-1 (a) (8)[3] that is required to purchase electricity from the plaintiffs. The plaintiffs are the owners and operators of a resource recovery facility (facility), as defined by General Statutes § 22a-260 (11),[4] located in Preston, which produces electric energy from solid waste.

Prior to the construction of the facility, the plaintiffs and the defendant entered into an electrical energy purchase agreement (agreement) whereby the defendant agreed to purchase the entire output of electrical energy from the plaintiffs' facility. The parties entered into the agreement pursuant to General Statutes (Rev. to 1989) § 16-243e.[5] Section 16-243e requires an electric

[3] General Statutes § 16-1 (a) (8) provides: " 'Electric company' includes every corporation, company, association, joint stock association, partnership or person, or lessee thereof, owning, leasing, maintaining, operating, managing or controlling poles, wires, conduits or other fixtures, along public highways or streets, for the transmission or distribution of electric current for sale for light, heat or power within this state, or engaged in generating electricity to be so transmitted or distributed for such purpose, but shall not include a private power producer, as defined in section 16-243b, a municipal electric utility established under chapter 101, a municipal electric energy cooperative established under chapter 101a, an electric cooperative established under chapter 597 or any other electric utility owned, leased, maintained, operated, managed or controlled by any unit of local government under any general statute or any public or special act . . . ."

[4] General Statutes § 22a-260 (11) provides: " 'Resources recovery facility' means a facility utilizing processes aimed at reclaiming the material or energy values from solid wastes . . . ."

[5] General Statutes (Rev. to 1989) § 16-243e provides: "Any electric company, as defined in section 16-1, purchasing electricity generated by a resources recovery facility, as defined in section 22a-260, owned by or operated by or for the benefit of a municipality or municipalities, shall enter into a contract with the owner of such facility requiring the electric company to purchase such electricity, for a period beginning on the date that the facility begins generating electricity and having a duration of not less than

company that purchases electricity generated by a resource recovery facility owned or operated by or for the benefit of a municipality to enter into a contract, with a minimum duration of twenty years, in which the electric company agrees to purchase the electricity generated by the facility "at the same rate that the electric company charges the municipality or municipalities for electricity," referred to generically as the "municipal rate."

This case is the second appeal to this court in the continuing saga between these parties concerning this agreement and the meaning of § 16-243e. By way of background, in 1987, the parties entered into the statutorily mandated agreement and obtained approval of the agreement from the department. *Southeastern Connecticut Regional Resources Recovery Authority*, Department of Public Utility Control, Docket No. 87-06-12 (October 6, 1987). In its ruling approving the agreement, the department mandated that the defendant pay the municipal rate for the facility's entire output of electricity. Id. The defendant appealed to the

twenty years, at the same rate that the electric company charges the municipality or municipalities for electricity."

This is the text of the statute as it appeared at the time the agreement was entered into by the parties and approved by the department. It was amended by Public Acts 1994, No. 94-92, § 1, to clarify the language to comport with our interpretation of the statute in *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 210 Conn. 349, 357–58, 554 A.2d 1089 (1989). See 37 S. Proc., Pt. 3, 1994 Sess., p. 994; 37 H.R. Proc., Pt. 12, 1994 Sess., pp. 4333–34. The statute, as amended, provides: "Any electric company, as defined in section 16-1, purchasing electricity generated by a resources recovery facility, as defined in section 22a-260, owned by, or operated by or for the benefit of, a municipality or municipalities, shall enter into a contract with the owner of such facility requiring the electric company to purchase *all of the electricity generated at such facility from waste which originated in the franchise area of the electric company,* for a period beginning on the date that the facility begins generating electricity and having a duration of not less than twenty years, at the same rate that the electric company charges the municipality or municipalities for electricity." (Emphasis added.)

Superior Court, challenging the constitutionality of § 16-243e and the department's interpretation of that statute.[6] Upon consideration of a reserved question from the trial court, we concluded that the defendant was obligated by § 16-243e to pay the municipal rate for only that portion of the electrical output attributable to waste that is obtained by the facility from municipalities within the defendant's franchise area (franchise waste), i.e., those towns in which it serves customers.[7] *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 210 Conn. 349, 357–58, 554 A.2d 1089 (1989). We reached that conclusion because we determined that § 16-243e requires an electric company that purchases electricity from a resource recovery facility that is owned or operated by or for the benefit of a municipality or municipalities to pay the same rate that the electric company charges the municipalities for electricity. Id. If a municipality is not within the electric company's franchise area, then, a fortiori, the electric company

---

[6] While that appeal was pending, the parties entered into, and the department approved, an interim agreement that allowed for contingent rates in the event that it was concluded as a matter of law that (1) § 16-243e is unconstitutional because of federal law preemption, or (2) the defendant is not obligated to pay the municipal rate for energy attributable to waste obtained from towns outside of its franchise. *Southeastern Connecticut Regional Resources Recovery Authority*, Department of Public Utility Control, Docket No. 87-06-12 (November 30, 1988). This is the agreement that is at issue here. Only the latter contingency has come to pass because this court declined to reach the issue of constitutionality, and the question of federal preemption is not yet finally decided. See footnote 12 of this opinion.

[7] Southeastern Connecticut Regional Resources Recovery Authority is composed of eleven member towns; East Lyme, Griswold, Groton, Ledyard, Montville, New London, North Stonington, Norwich, Sprague, Stonington and Waterford. In addition, the facility accepts waste from Madison and Guilford. The defendant does not service customers in Norwich, the Jewett City borough of Griswold, the city of Groton and portions of the town of Groton. These areas are, therefore, outside of the defendant's franchise area. Approximately 30 percent of the facility's waste comes from those nonfranchise areas. Accordingly, 30 percent of the output is purchased at the avoided cost rate and 70 percent is purchased at the municipal rate. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 210 Conn. 349, 357–58, 554 A.2d 1089 (1989).

does not charge that municipality for electricity. Consequently, we concluded that § 16-243e is not applicable to electrical output that is attributable to nonfranchise waste. Id.

We further concluded, however, that an electric company is required to purchase the entire electrical output of a resource recovery facility. Id., 358. Accordingly, it was necessary at that time to ascertain the applicable rate payable for electrical output attributable to nonfranchise waste. The facility, in addition to being a resource recovery facility, is also a private power producer within the meaning of General Statutes § 16-243b (a) (3).[8] General Statutes § 16-243a (b)[9] requires an electric company to purchase the *entire* output of a private power producer.[10] Section 16-243a (c) [11] provides that an electric company need pay only its "avoided costs" rate for energy purchased from a private power producer. We interpreted the foregoing statutes to require that the defendant: (1) purchase the entire electrical output of the facility; (2) pay the municipal rate as established in § 16-243e for the electrical output attributable to franchise waste; and (3) pay the avoided cost rate of § 16-243a (c) (2) for electrical output attributable

[8] General Statutes § 16-243b (a) (3) provides in relevant part: " 'Private power producer' means . . . (C) . . . a political subdivision of the state or any other person, firm or corporation . . . which generates electricity solely through ownership of one hundred per cent or less of a private power production facility . . . ."

[9] General Statutes § 16-243a (b) provides in relevant part: "Each electric public service company . . . shall: (1) Purchase any electrical energy and capacity made available . . . by a private power producer . . . ."

[10] The agreement, in § 10, incorporates this requirement: "Seller shall deliver to Buyer and *Buyer shall purchase from Seller the entire net electric output of the Facility for the Term* as reduced by electrical losses as described in Section 6(b) of this Agreement." (Emphasis added.)

[11] General Statutes § 16-243a (c) provides in relevant part: "The rates for electricity purchased from a private power producer shall be based on the full avoided costs of the electric public service company . . . ."

to nonfranchise waste.[12] *Connecticut Light & Power Co.*
v. *Dept. of Public Utility Control*, supra, 210 Conn. 358.

The plaintiffs' facility became operational in January,
1992, and began producing and providing electricity
pursuant to the agreement between the parties at that
time. The agreement incorporated by reference a
description of the facility that included specifications,
which stated that the facility's electrical output would
be *approximately* 13.85 MW based on *approximately*
600 tons of waste processed per day.[13] When the plain-
tiffs notified the defendant that the facility was com-

---

[12] We concluded that it was unnecessary to address the constitutional
question because it "[was] not . . . absolutely necessary to the decision of
the case . . . ." (Internal quotation marks omitted.) *Connecticut Light &
Power Co.* v. *Dept. of Public Utility Control*, supra, 210 Conn. 358 n.17. The
defendant, however, has pursued the constitutional issue of federal law
preemption of § 16-243e in an appeal to the Federal Energy Regulatory
Commission. The Federal Energy Regulatory Commission concluded that,
at least inasmuch as the municipal rate statute requires payment at a rate
in excess of an electric company's avoided cost rate, the statute is preempted
by federal law. *Connecticut Light & Power Co.*, 70 Federal Energy Regulatory
Commission ¶61,012, reconsideration denied, 71 Federal Energy Regulatory
Commission ¶61,035 (1995). An appeal from this decision was taken to the
Court of Appeals for the District of Columbia Circuit, but was dismissed
for lack of jurisdiction. *Niagra Mohawk Power Corp.* v. *Federal Energy
Regulatory Commission*, 117 F.3d 1485 (D.C. Cir. 1997). The determination
of that issue is currently pending in the United States District Court for the
District of Connecticut. The parties have not raised a constitutional challenge
in the present appeal. Accordingly, we proceed on the assumption that § 16-
243e is valid.

[13] The agreement, in § 2, incorporates by reference exhibit A, entitled
"Facility Description." Section 2 provides: "(A) The Facility will generate
electrical energy by the use of municipal solid waste as described in Exhibit
A, attached hereto and incorporated herein." Exhibit A provides: "The Facil-
ity consists of (a) waste combustion/boiler trains, fuel handling equipment,
air pollution control equipment and related auxiliary equipment and systems
for receiving and combusting solid waste and producing steam; (b) a turbine/
generator and related equipment for converting the energy in the steam to
electricity; and (c) buildings and structures for housing the equipment and
related activities.

"The facility will have a nameplate capacity of approximately 600 tons
per day of solid waste (5,000 BTU/LB. HHV). The turbine/generator will
have nameplate capacity, net of station use, of approximately 13.85 MW."

plete and ready to begin supplying electricity, they also gave notice that its output would be 13.91 MW and that the energy output and waste throughput were expected to increase owing to operational improvements. Upon receiving that notice, the defendant acknowledged that "all Prerequisites for Purchase under the Contract were satisfied on [January 5, 1992]."

Soon after the facility became operational, it began to generate more than an average of 13.85 MW on an hourly basis.[14] It did not, however, exceed 13.85 MW on a monthly average until significantly later. The defendant does not dispute that it has a statutory obligation, incorporated into the agreement, to purchase all of the facility's energy output, even that above the 13.85 MW level. It does challenge, however, its obligation to pay the contract price, i.e., the municipal rate, for production in excess of 13.85 MW. In January, 1993, the defendant filed with the department a request for resolution of a payment dispute.[15] In its request, the defendant argued that the output in excess of 13.85 MW, measured

[14] The agreement contains no provision with respect to the proper basis upon which to measure the 13.85 MW output. In its request, the defendant argued that the 13.85 MW limit should be determined on an hourly basis. The department noted that there are many factors that will cause the specific output to vary greatly in short periods (e.g., hours or days). It concluded that a monthly average would fairly take account of these variants and that the 13.85 MW maximum should, therefore, be based on a monthly average. The defendant challenged this decision in the trial court. The court concluded, however, that there was substantial evidence in the record to support the department's conclusion and, therefore, affirmed the department's decision. This issue has not been raised on appeal to this court. We, therefore, accept that the 13.85 MW "limit" is measured on a monthly average.

[15] The plaintiffs sought to stay this declaratory ruling proceeding and to compel arbitration. They argued that the dispute related to "technical and engineering matters," the resolution of which is committed to arbitration by the agreement. The trial court concluded that this was a payment dispute to be properly resolved before the department, not at arbitration. The Appellate Court affirmed the decision of the trial court and remanded the case to the department. *Connecticut Resources Recovery Authority* v. *Connecticut Light & Power Co.*, 34 Conn. App. 246, 249, 641 A.2d 398 (1994).

on an hourly basis, was not covered by the agreement and, therefore, that it was obligated to pay only the significantly lower "current avoided costs" rate for any electrical output in excess of that figure.[16] The plaintiffs subsequently petitioned the department for a declaratory ruling that the municipal rate was applicable to the electrical output of its facility in excess of 13.85 MW.

In response to these requests, the department ruled that the defendant was not obligated to pay the municipal rate, as specified in the agreement, for energy output in excess of 13.85 MW, calculated on the basis of a monthly average. It, therefore, resolved the payment dispute in favor of the defendant and denied the plaintiffs' petition. Its conclusion was based on the fact that a description of the facility indicating an output of 13.85 MW, a specification at the time the agreement was ratified, was incorporated into the agreement by reference; see footnote 13 of this opinion; creating a limitation on the maximum output for which the defendant was liable to pay the municipal rate. Additionally, the department noted that its approval of the agreement had been contingent on the facility being built as specified, which included a limitation on output of 13.85 MW. The plaintiffs appealed to the Superior Court pursuant to General Statutes §§ 4-176 and 4-183.[17] The court, exercising plenary review over the interpretation of the agreement

[16] While this declaratory ruling proceeding was pending, the plaintiffs received, in December, 1993, a permit from the department of environmental protection to increase the amount of waste processed on a daily basis from 600 tons to 689 tons. The output has been higher than 13.85 MW for twelve of the seventeen months following receipt of the permit from the department of environmental protection. Prior to receipt of the permit, the facility exceeded the 13.85 MW figure on an hourly basis, but it never exceeded that amount on a monthly average.

[17] General Statutes § 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

General Statutes § 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved

and the relevant statute, sustained the plaintiffs' appeal. It concluded that § 16-243e provides for the exclusive use of the municipal rate for the purchase by an electric company from a resource recovery facility of electrical output attributable to franchise waste and that the agreement unambiguously calls for payment of the municipal rate for the entire output so attributed. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The defendant urges this court to defer to the department's decision because, it argues, the resolution of the issue presented requires an interpretation of ambiguous contract terms, which presents a question of fact that is properly resolved by the department.[18] The plaintiffs respond that this case presents pure questions of law based on the construction of a statute and an unambiguous contract. They argue that our review is, therefore,

---

by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal." General Statutes § 4-166 (3) provides in relevant part: " 'Final decision' means . . . (B) a declaratory ruling issued by an agency pursuant to section 4-176 . . . ."

[18] General Statutes § 4-183 (j), which contains the standard of review for an administrative appeal, provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) *affected by other error of law;* (5) *clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;* or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment." (Emphasis added.)

plenary and that no deference is owed to the department's decision. We agree with the plaintiffs.

The dispute regarding the proper standard of review stems from the fact that resolution of the issue presented involves both an interpretation of a statute, § 16-243e, and of the agreement between the parties. Statutory construction is generally a question of law. *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 318, 702 A.2d 1180 (1997). "Although courts ordinarily defer to an agency's interpretation of statutory text, where, as in this case, the construction of the statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . that construction constitutes a question of law for which deference is not warranted." (Citation omitted; internal quotation marks omitted.) *Burinskas* v. *Dept. of Social Services*, 240 Conn. 141, 147, 691 A.2d 586 (1997); see also *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642, 708 A.2d 202 (1998). Although § 16-243e has been subjected to judicial review, this particular aspect has not; nor has the department's interpretation of the statute been the object of time-tested agency interpretation. The interpretation of § 16-243e is, therefore, a pure question of law to which no deference to the department's interpretation is owed.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted; internal quotation marks omitted.) *Levine* v. *Massey*, 232 Conn. 272, 277–78, 654 A.2d 737 (1995). For the reasons discussed below, we conclude that the agreement is not ambiguous and, thus, judicial review of both the statute and the contract is plenary. The trial court, therefore,

employed the proper standard of review. Furthermore, when this court is "called upon to review the legal conclusions of the trial court . . . our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 618, 674 A.2d 805 (1996).

The defendant maintains that this is an ambiguous contract that requires a factual determination of the intent of the parties in order to construe its effect. In construing the meaning of the parties' agreement, we are guided by well established rules. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the *language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.* . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. *A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . 24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.,* 239 Conn. 284, 295, 685 A.2d 305 (1996)." (Emphasis added; internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop,* 241 Conn. 678, 686–87, 697 A.2d 1137 (1997).

The defendant argues that its interpretation of the intent of the parties reasonably follows from the supposed ambiguity in two provisions of the agreement. First, the description of the facility, incorporated into the agreement by reference, lists certain specifications of the facility, including a statement that "[t]he Facility will have a nameplate capacity of *approximately* 600 tons per day of solid waste (5000 BTU/LB. HHV). The turbine/generator will have nameplate capacity, net of station use, of *approximately* 13.85 MW." (Emphasis added.) The defendant argues that this language establishes that the facility will have a maximum output of 13.85 MW. It claims that any output above that amount is excess not contemplated by the agreement and not required to be purchased at the municipal rate.

The second provision of the contract relevant to the defendant's argument is § 11, entitled "Rates for Purchase." Subsection (b) of that section provides that "for the twenty (20) years immediately following the In-Service Date, all electricity delivered by Seller to Buyer at the point of interconnection pursuant to the terms of the Agreement, shall be purchased by Buyer at the Average Municipal Retail Rate . . . ." The defendant argues that this provision requires it to pay the municipal rate only for energy delivered "pursuant to the terms of this agreement." Because, the defendant contends, any output in excess of 13.85 MW is not delivered "pursuant to the terms of this Agreement," it follows that the purchase price is not governed by the agreement. We are not persuaded.

The defendant's interpretation of the agreement cannot withstand review because the ambiguity it alleges does not emanate from the language of the agreement, but from the defendant's subjective interpretation of that language. There is no indication in the contract that the phrase "approximately 13.85 MW" was intended to represent a maximum output figure. To the contrary,

the contract as a whole demonstrates that the parties did not intend 13.85 MW to represent a limitation on output or that output in excess of 13.85 MW would be sold at any rate other than the municipal rate. Most significantly, the agreement clearly contemplates the purchase and sale of electricity in excess of the 13.85 MW approximated in the facility description. Section 10 of the agreement, entitled "Obligation to Sell and to Purchase," requires that the "Seller shall deliver to Buyer and Buyer shall purchase from Seller the entire net electric output of the Facility for the Term as reduced by electrical losses as described in Section 6(b) of this Agreement." If, as the defendant argues, the municipal rate is not applicable, there is no alternative rate provided for electricity purchased in excess of 13.85 MW.[19]

The defendant argues, however, that the absence of a specific rate for excess output implies that the plaintiffs agreed to accept the avoided cost rate, rather than the municipal rate, for output not covered by the contract. The defendant's argument that the avoided cost rate is the applicable rate for output in excess of 13.85 MW relies on our interpretation of § 16-243e in *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* supra, 210 Conn. 355, in which we acknowledged that the plaintiff's facility is a private power producer as defined by § 16-243b (a) (3), as well as a resource recovery facility, and that an electric company is obligated to purchase energy from private power producers only

[19] To overcome the absence of an alternative rate in the agreement, the defendant argues that the agreement does, in fact, contemplate other rates. The argument is unavailing. The rates to which the defendant refers are very specific in their applicability. They are the rates to be paid after the twenty year term expires, an alternative rate to be paid if the municipal rate statute is declared unconstitutional, and a rate that is to be paid for that 30 percent of the output that is nonfranchise energy. There is absolutely no alternative rate provided in the agreement for electrical output in excess of 13.85 MW.

at the avoided cost rate pursuant to § 16-243a (c) (2). This analysis misconstrues our decision. In *Connecticut Light & Power Co.*, we concluded that §§ 16-243a and 16-243b, governing private power producers, may apply to resource recovery facilities. They are applicable, however, *only* when § 16-243e, which governs resource recovery facilities, is not applicable because the energy output is attributable to nonfranchise waste. Id., 357. The defendant incorrectly assumes that the avoided cost rate of § 16-243a (c) (2) automatically applies to any output arguably not governed by the agreement. The only statutory rate applicable to output attributable to franchise waste, however, is the municipal rate contained in § 16-243e. Id. Moreover, even if we assume, arguendo, that the plaintiffs can waive the municipal rate mandated by § 16-243e for output attributable to franchise waste, there is no indication here that the plaintiffs agreed to accept a lower rate.

In addition to the absence of an alternative rate for excess output, the agreement also does not contain a definitive limitation on output in the body of the agreement. It includes only an approximation of output in specifications attached as an exhibit to the agreement. Moreover, the agreement contains no mechanism by which to measure the alleged limitation on output. There is no indication in the agreement whether that purported limit of 13.85 MW should be measured on an hourly basis, or on a daily, monthly or annual average.[20] Finally, the defendant's interpretation of the facility agreement ignores the use of the word "approximately" and unilaterally rewrites the provision as if it

---

[20] The department acknowledged in its ruling that there are numerous factors that cause a facility's output to vary in short periods of time. For that reason, the department chose to measure the output on a monthly basis as a more accurate reflector of the actual output. In light of these variants, known throughout the industry, it would have been expected that the parties would include a specification regarding how the output limitation is to be measured.

stated "a maximum of 13.85 MW." We will not, however, torture the language of the contract to create an ambiguity where none exists. *Lawson* v. *Whitey's Frame Shop*, supra, 241 Conn. 686–87. An ambiguity must be apparent from the document, not from "one party's subjective perception of the terms." Id. The term "approximately" "must be accorded its common, natural, and ordinary meaning and usage . . . ." Id. We cannot reconcile the defendant's claim that 13.85 MW is an absolute maximum with the use of the word "approximately." In the absence of any rate other than the municipal rate or of specific limitations on output in the contract, we cannot conclude that the parties intended to create a limitation on output and an alternative rate for the output of the plaintiffs' facility that exceeds that limitation.

Other aspects of this agreement not directly related to the rate provision or the facility description also militate against concluding that the parties intended 13.85 MW to be a limitation on output. First, the defendant is obligated to purchase the entire output, both by statute and by the terms of the agreement. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 210 Conn. 355–58. Establishing a maximum output would be inconsistent with that obligation. Second, the agreement closely tracks the relevant statutory requirements.[21] The statute mandates that the municipal rate be paid for output attributable to franchise waste. There is no indication that the parties intended to deviate from the statute in this single aspect. Third, the contract provides, in § 4, that the facility

---

[21] For example, the agreement provides that: (1) the buyers will purchase the entire net output; (2) the rate for output attributable to franchise waste will be the municipal rate; (3) the alternative rate for output attributable to nonfranchise waste will be the avoided cost rate; and (4) the term of the agreement will be twenty-five years, but purchases at the municipal rate will last only for twenty years. Each of these provisions comports with the statutory mandate of § 16-243e as interpreted in *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 210 Conn. 355–58.

must be constructed and operated prudently and that the plaintiffs are obligated to maximize output within the confines of that restriction. An arbitrary maximum of 13.85 MW would be inconsistent with that mandate. We believe, moreover, that it would be unreasonable to conclude that sophisticated parties such as the plaintiffs and the defendant would enter into an agreement by which they intended to establish a maximum output of 13.85 MW and a substantially lower rate for the excess energy above that amount in the manner advocated by the defendant.

Consequently, we are not persuaded that the parties' agreement established a maximum limit above which the excess output is governed by a rate not mentioned anywhere in the agreement. Neither the facility description nor the rate provision, when construed in light of the entire agreement and the statute that mandates its relevant terms, leaves any doubt as to the intent of the parties. The definitive terms of the agreement require that, to the extent that electrical output is attributable to franchise waste, it must be purchased at the municipal rate.

The judgment is affirmed.

In this opinion the other justices concurred.