[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. STATEMENT OF THE CASE
This is an administrative appeal from a final decision of the State of Connecticut, Department of Banking (the department), brought pursuant to General Statutes §§ 4-183 and the Connecticut Uniform Securities Act (CUSA), General Statutes § 36b-2 et seq. The plaintiff is First Providence Financial Group, LLC (First Providence); the defendants are the Commissioner of the department and the department itself.
 II. PROCEDURAL HISTORY
First Providence has been registered in Connecticut under CUSA as a broker-dealer since March, 1996. Its offices are located in New York City. (Tr. Vol. 15, p. 39; Ex. B-7.) On September 22 and 23 and November 2, 1999, and February 16 and April 14, 2000, employees of the department's Securities and Business Investments Division (the division) conducted an investigation of the plaintiff and an examination of the CT Page 15424 plaintiff's books and records pursuant to General Statutes §§ 36b-26
(a) and 36b-14 (d). (Tr. Vol. 1, p. 32; Ex. 1, 6, K.) On April 10, 2000, the division sent a letter notifying the plaintiff of the anticipated April 14, 2000 examination and requesting that certain documents be produced for review on that date. (Ex. K.)
Following the examination, charges were brought by the Banking Commissioner against the plaintiff, alleging several violations of CUSA. (Corrected Final Decision, p. 1.) Pursuant to the Uniform Administrative Procedures Act (UAPA), General Statutes § 4-166 et seq., the department held a sixteen day hearing beginning on May 9, 2000 and concluding on June 15, 2000 before Hearing Officer Alan J. Cicchetti. Following the hearing, Hearing Officer Cicchetti submitted his Proposed Findings of Fact, Conclusions of Law and Proposed Order to the commissioner, pursuant to General Statutes § 4-179 (c).
The Commissioner issued his Corrected Final Decision on November 27, 2000. The Commissioner found that the plaintiff had committed one violation of General Statutes § 36b-14 (d), one violation of Section 36b-15 (a)(2)(H) of the Regulations of Connecticut State Agencies and of General Statutes § 36b-6
(b) and one violation of Section 36b-31-6f (b) of the Regulations of Connecticut State Agencies. As a sanction for these violations, the Commissioner suspended the registration of the plaintiff until payment of the $30,000.00 fine.[1] (Corrected Final Decision, pp. 38-40.)
 III. JURISDICTION
A. Aggrievement
General Statutes § 36b-30 provides, "[a]ny person aggrieved by a final decision of the commissioner may appeal to the superior court for the judicial district of New Britain in accordance with the provisions of section 4-183." General Statutes § 4-183 (a) provides in relevant part that "[a] person . . . who is aggrieved by a final decision may appeal to the Superior Court. . . ." "To be an aggrieved person, one must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specially and injuriously affected as to property or other legal rights." Smith v. Planning Zoning Board,203 Conn. 317, 321, 524 A.2d 1128 (1987). In the present matter, the plaintiff's registration was revoked by a Final Decision of the Commissioner. The defendant in this appeal has not challenged aggrievement. This court finds that the plaintiff is aggrieved. CT Page 15425
B. Timeliness of Appeal
General Statutes § 4-183 (c) provides, in relevant part, that "[w]ithin forty-five days after mailing of the final decision under section 4-180 . . . a person appealing . . . shall serve a copy of the appeal on the agency that rendered the final decision . . . and file the appeal with the clerk of the superior court. . . ."
The plaintiff claims to have received the Corrected Final Decision dated November 27, 2000 by personal delivery on November 28, 2000. (Plaintiff's Complaint, p. 7.) This appeal was served on the commissioner on January 8, 2001 and was filed with the clerk of the superior court on January 9, 2001. (Marshall's Return of Service.) Consequently, this court finds that this appeal is timely and that this court has jurisdiction.
 IV. STANDARD OF REVIEW
"Judicial review of [an administrative agency's] action is governed by the [UAPA] . . . and the scope of that review is very restricted. . . ." (Brackets in original; citations omitted.) Cadlerock Properties v.Commissioner, 253 Conn. 661, 668, 757 A.2d 1, cert denied,121 S.Ct. 1089,148 L.Ed.2d 963 (2001). "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decision are: (1) [i]n violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j).
"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . ." (Citations omitted.) Cadlerock Properties v. Commissioner, supra, 253 Conn. 676.
"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. . . . An administrative finding is supported by substantial evidence if the record affords a CT Page 15426 substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . ." (Citations omitted.) Id. "[S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted.) Id., 677.
"The determination of whether substantial evidence exists is subject to de novo review by this court." Labenski v. Goldberg, 33 Conn. App. 727,733, 638 A.2d 614 (1994). Further, the court must search the entire record to determine whether substantial evidence exists to support the agency's findings of fact, and whether the conclusions drawn from those facts are reasonable. See Dolgner v. Alander, 237 Conn. 272, 283,676 A.2d 865 (1996). "In determining whether an administrative finding is supported by substantial evidence, a court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." Bancroft v. Commissioner of MotorVehicles, 48 Conn. App. 391, 400, 710 A.2d 807 (1998).
"Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Brackets in original; citations omitted.) Cadlerock Properties v. Commissioner, supra, 253 Conn. 669.
The rules of statutory construction apply to administrative agencies. See Preston v. DEP, 218 Conn. 821, 829, 591 A.2d 421 (1991). One such rule provides, "that when a state agency s determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . ." (Citation omitted.)Dortenzio v. Freedom of Information Commission, 48 Conn. App. 424,430-31, 710 A.2d 801 (1998).
 V. DISCUSSION
CT Page 15427
The CUSA, adopted by the State of Connecticut in 1977, is largely identical to the Model Uniform Securities Act of 1956 (the Model Act), which was approved by the Conference of Commissioners on Uniform State Laws and the American Bar Association in 1956. The Model Act was drafted by Professor Louis Loss of Harvard Law School and Research Assistant Edward Cowett. Official Comments from the Conference provide an expanded explanation of the provisions of the Model Act and are of some assistance in interpreting CUSA.
A. The Plaintiff's Claims of Error
The plaintiff makes twenty one specific claims of error which can each be addressed by reviewing each statutory violation found by the commissioner.
1. Jurisdictional Claims — General Statutes § 36b-6 (b) and36b-15 (a)(2)(H)
The plaintiff claims that the Commissioner does not have jurisdiction over the plaintiff's conduct and practices that do not have any nexus with the state of Connecticut. This claim addresses the violation of General Statutes §§ 36b-15 (a)(2)(H) and 36b-6 (b) and presents a matter of first impression since these particular statutes have never before been the subject of judicial scrutiny in Connecticut.
General Statutes § 36b-6 (b) prohibits the employment of unregistered agents. The Commissioner found that the plaintiff did employ unregistered individuals and that this practice was "a dishonest or unethical practice," which gave rise to a violation of General Statutes § 36b-15 (a)(2)(H) and resulted in the revocation of the plaintiff's registration. (Corrected Final Decision pp. 22-29; Findings Nos. 33-47.) In his decision, the Commissioner notes that there is no "in state" requirement for a violation of either General Statutes § 36b-6 (b) or General Statutes § 36b-15 (a)(2)(H) and further states that under his power to act "in the public interest" supports the revocation of the plaintiff's registration even though there is no evidence that the unethical practices ever touched the state of Connecticut directly. (Corrected Final Decision p. 25.)
There is no case law in Connecticut which interprets these sections.[2]
Neither the legislative history. for the CUSA nor the Official Commentary to the Model Code is of any assistance to the court on this issue. Consequently, the court must resort to the rules of statutory construction to analyze this issue. CT Page 15428
 a. Rules of Statutory Construction
"Statutory construction is generally a question of law." SoutheasternConn. Regional Resources Recovery Authority v. DPUC, 244 Conn. 280, 290,709 A.2d 549 (1998). "In interpreting statutes, we are guided by well established tenets of statutory construction. [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same subject matter." (Brackets in original; internal quotation marks omitted.) Bittle v. Commissioner of SocialServices, 249 Conn. 503, 507, 734 A.2d 551 (1999).
Words and phrases used in statutes "shall be construed according to the commonly approved usage of the language. . . ." General Statutes § 1-1
(a). "[If the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent." (Internal quotation marks omitted.) Office of Consumer Counsel v. Department of Public UtilityControl, 246 Conn. 18, 29, 716 A.2d 78 (1998).
"In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended." (Internal quotation marks omitted.) Willow Springs Condominium Association, Inc.v. Seventh BRT Development Corp., 245 Conn. 1, 26, 717 A.2d 77 (1998). A "statute must be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation." (Internal quotation marks omitted.) Luce v. UnitedTechnologies Corp., 247 Conn. 126, 137, 717 A.2d 747 (1998). "[C]ompelling principles of statutory construction . . . require [the Supreme Court] to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . [The Supreme Court] must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." (Internal quotation marks omitted.) Officer of Consumer Counselv. Department of Public Utility Control, supra, 246 Conn. 42. "Courts may not by construction supply omissions in a statute, or add exceptions merely because it appears to them that good reasons exist for adding them." (Internal quotation marks omitted.) State v. Baker, 195 Conn. 598,602, 489 A.2d 1041 (1985). "[S]tatutes must be construed, if possible, such that no clause, sentence, or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) Ferrigno v.Cromwell Development Associates, 244 Conn. 189, 196, 708 A.2d 1371
(1998). "It is well settled that [t]he legislature is presumed to be CT Page 15429 aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them." (Alterations in original; internal quotation marks omitted.) Stern v. Allied Van Lines, Inc.,246 Conn. 170, 180, 717 A.2d 195 (1998).[3]
 b. Analysis of General Statutes § 36b-6 (b)[4]
Since there is no case law or legislative intent which can be instructive, the court must first start with the language of the statute. The commissioner is correct that neither General Statutes §36b-6 (b) nor § 36b-15-(a)(2)(H) explicitly require that the conduct have a nexus with the state of Connecticut. Nevertheless, the court cannot look at these two statutory provisions in a vacuum. The court must interpret them in light of other statutes in order to uphold a cohesive body of securities law.
General Statutes § 36b-6 (b) requires the employment of only agents who are "registered under sections 36b-2 to 36b-33." This would encompass the requirement in General Statutes § 36b-6 (a) which provides, "[n]o individual shall transact business as an agent in this state unless he is . . . registered . . ." (Emphasis added.) Therefore, if an unregistered agent is prohibited from doing business in this state in subsection (a) of General Statutes § 36b-6, it is reasonable to extend the in state requirement to subsection (b) by interpreting it to mean that broker-dealers may not employ unregistered agents to do business in this state. It is also notable that the other subsections of General Statutes § 36b-6 include the "in this state" language. Since subsection (b) discusses employment of unregistered persons and not the actual transaction of business, the absence of this language therein is understandable. This court cannot apply subsection (b) without taking the other subsections into account. It would be nonsensical to interpret subsection (b) to apply to business conducted anywhere, while all the other subsections of the same statutes are restricted by their plain language to only business transacted in this state. Furthermore, General Statutes § 36b-33 (a) and (b), by their clear terms, provide that General Statutes § 36b-6 applies only to persons who buy or sell or offer to buy or sell when an offer to do so is "made and accepted in thisstate." (Emphasis added.) This statute does not distinguish among the subsections of General Statutes § 36b-6, but instead applies the in state requirement to the entire statute.
Accordingly, since there is no substantial evidence either in the findings of the Commissioner or elsewhere in the record that the conduct which gave rise to the violation of General Statutes § 36b-6 (b) took place in this state, the court finds that the commissioner had no jurisdiction to revoke the registration of the plaintiff on this basis. CT Page 15430 Accordingly, the court finds for the plaintiff on this claim of error.
 c. Analysis of General Statutes § 36b-15 (a)(2)(H)[5]
The commissioner found one violation of General Statutes § 36b-6
(b) and General Statutes § 36b-15 (a)(2)(H). Therefore, the court must determine if the language of General Statutes § 36b-15 (a)(2)(H) will support the violation for conduct that did not occur in Connecticut.
The plain language of General Statutes § 36b-15 (a)(2)(H) does not include the in state requirement. The commissioner based his finding for this violation on the employment of unregistered cold callers by First Providence, labeled the conduct "dishonest and unethical" and determined that revocation on this ground is in the public interest. (Corrected Final Decision, pp. 22-29.) The Commissioner cites to § 36b-31-15a (b) of the Regulations of Connecticut State Agencies which provides, "[i]n construing the term `dishonest or unethical practices in the securities . . . business' as used in . . . section [36b-15 (a)(2)(H)] of the general statutes, the commissioner may consider whether the conduct in question is proscribed by any rule of a national securities exchange or self regulatory organization registered under federal securities laws administered by the United States Securities and Exchange Commission." (Corrected Final Decision, p. 23) The Commissioner then took judicial notice of the National Association of Securities Dealers (NASD)[6]. NASD Rule 1031 requires the registration with the NASD of all persons engaged in the securities business. Other NASD policy statements cited by the Commissioner also proscribe the practice of cold calling by unregistered individuals. None of the NASD rules require that conduct violative of these rules and policy statements be linked to the state in which the disciplinary proceedings take place. In his findings, the Commissioner found that none of the individuals that were found to have made "cold calls" were registered with the NASD at the relevant time. Additionally the Commissioner concluded that the revocation of the plaintiff's registration is in the public interest since unregistered persons were engaging in the securities business in violation of the NASD rules.
There was substantial evidence in the record that unregistered cold callers were prequalifying potential customers. The Dun Bradstreet cards contained a notation of the name of the "Plan Contact Person" who was the person who had made the cold calls. (Transcript Vol. 2, pp. 47-48, 51, 57, 67; Ex. J; Findings 36, 37.) Cold callers pre-qualified potential customers as to financial status and investment history and noted this information on the Dun Bradstreet cards. (Transcript Vol. 2, pp. 95-96, 111, Finding 35.) Mr. Zalewski's name appeared on more than CT Page 15431 half of the cards. (Transcript Vol. 2, pp. 81, 88-90; Ex. J; Finding 38.) Mr. Zalewski was employed by the plaintiff, but was not registered with the NASD during the relevant time periods. (Transcript Vol. 2, p. 97, Ex. J; Findings 39, 40.) The court concludes that this alone is substantial evidence to support the General Statutes § 36b-15
(a)(2)(H) violation, although there is additional evidence in the record and in the commissioner's findings to support the revocation on this ground.
The Commissioner's reasoning in this regard is sound. There is substantial evidence that unregistered individuals did engage in the securities business by making "cold calls" and obtaining information on financial status and investment history from potential customers. There is no requirement in General Statutes § 36b-15 (a)(2)(H) that such proscribed conduct must have some link to the state of Connecticut before a violation of the statute can be found. Nor does any other section of the CUSA impose the in state requirement on a violation of General Statutes § 36b-15 (a)(2)(H), as General Statutes § 36b-33 did for General Statutes § 36b-6. This absence is conspicuous, for if the legislature did intend to explicitly include the in state requirement elsewhere in the CUSA, it could also have done so explicitly here.
Finally, the legislative history provides some evidence that the CUSA was intended to protect the interests of citizens of Connecticut and, thus, supports the commissioner's finding that the revocation is in the "public interest." In introducing the bill to the House, Representative William J. Scully, Jr. stated "[w]e feel this bill will go a long way to help the people of the State to protect their interest. . . ." 20 H.R. Proc., Pt. 11, 1977 Sess., p. 4518. Furthermore, "the primary purpose behind [CUSA] was to institute comprehensive registration requirements and thereby improve surveillance of securities trading." ConnecticutNational Bank v. Giacomi, 233 Conn. 304, 320, 659 A.2d 1166 (1995).[7]
Therefore, the commissioner does have jurisdiction to find a violation of this statute.
Accordingly, since the Commissioner's findings as to the unregistered cold callers, the findings of dishonest and unethical business practices and the finding that his in the public interest to revoke the plaintiff's registration are supported by substantial evidence, and since there is no in-state requirement for a violation of General Statutes § 36b-15
(a)(2)(H), the violation of General Statutes § 36b-15 (a)(2)(H) and the revocation of the plaintiff's registration on this ground stands.[8]
2. Denial of Access/Reasonable Examination Issue — General Statutes§ 36b-14 (d)
CT Page 15432
In his Corrected Final Decision, the commissioner found that the plaintiff had violated General Statutes § 36b-14 (d) by denying the division examiners access to its offices and its records. In support of this violation, the Commissioner made four findings of fact:
 1) "On April 10, 2000, the Division sent First Providence a letter indicating that an examination would be conducted by the Division on April 14, 2000 and requesting that certain documents be made available at that time. (Tr. Vol. 9 at 120-121, Tr. Vol. 12 at 87; Ex. K)" (Finding of Fact (FOF) 82.)
 2) "On April 13, 2000, Attorney David Elliott sent a letter by fax to Wilder requesting an extension of time in order to prepare the documents requested by the Commissioner in the Division's April 10, 2000 letter. (Ex. 11)" (FOF 83.)
 3) "Members of the Division staff Mark Hornyak ("Hornyak") and Richard Lanuto ("Lanuto") arrived at First Providence on April 14, 2000 to conduct an examination. (Tr. Vol. 9 at 121, Tr. Vol. 12 at 139)" (FOF 84.)
 4) "Goldstein did not allow Hornyak or Lanuto onto the premises. (Tr. Vol. 9 at 123 and 127, Tr. Vol. 12 at 139-140, Tr. Vol. 5 at 62)" (FOF 85.)
General Statutes § 36b-14 (d) provides, "[a]ll the records of a . . . registered broker-dealer referred to in subsection (a) of this section are subject at any time or from time to time to such reasonable periodic, special or other examinations by the commissioner, within or without this state, as the commissioner deems necessary or appropriate in the public interest or for the protection of investors. Every . . . registered broker-dealer shall keep such records open to examination by the commissioner and, upon the commissioner's request, shall provide copies of any such records to the commissioner. . . ."
This statute has never before been the subject of judicial scrutiny and, consequently, its interpretation presents a question of first impression for this court. The Official Commentary to the Model Act § 203 states that "[f]ailure to submit to a reasonable inspection is a violation of the Act, which may result in an action by the Administrator. . . ." Indeed, the purpose behind this particular subsection as noted in New Jersey regarding a virtually identical CT Page 15433 provision, is to facilitate "investigation and checking to make certain that all requirements of the law and rules relative to the operation of the business are complied with." Mayflower Securities Co., Inc. v. Bureauof Securities in Division of Consumer Affairs of Department of Law andPublic Safety, 312 A.2d 497, 499 (1973).
In his Corrected Final Decision, the Commissioner notes that General Statutes § 36b-14 (d) does not require that any advance notice of an impending examination be given to the firm to be examined. (Corrected Final Decision, p. 33.) Nevertheless, in this case, advance notice was given. (Exhibit K.) Further, the Commissioner found that the market conditions that existed at the time in question were "not a compelling reason" to deny the division access and that "under the circumstances of this case, First Providence had no right to deny the Division examiners access to its premises." (Corrected Final Decision, p. 34.) Finally, the Commissioner notes that General Statutes § 36b-27 provides for a fine for a violation of General Statutes § 36b-14 (d). (Corrected Final Decision, pp. 34-35.)
The plaintiff claims that the division's examination was unreasonable because the division did not respond to the plaintiff's request for an extension of time to produce the requested documents, no notice was given that the division sought to actually come onto the plaintiff's premises, and the examination was not reasonable given the volume of requested documents and the financial climate at the time of the examination. The plaintiff asserts that it was not reasonable to be forced to choose between the financial well-being of its clients and the demands of the division examiners. Further, the plaintiff contends that there was no emergency that would have required the examination to take place on the noticed date. (Plaintiff's Brief, pp. 38-42.)
The word "reasonable" is not defined within the CUSA, nor has its definition in the context of a CUSA case been determined by case law. Therefore, this court must utilize the aforementioned rules of statutory construction in order to determine the meaning of "reasonable", and whether the examination conduct was "reasonable," and, ultimately, whether the violation of General Statutes § 36b-14 (d) is supported by substantial evidence.
Black's Law Dictionary, p. 1272 (9th Ed. 1999) defines "reasonable" as "[flair, proper, or moderate under the circumstances." It would appear that the parties to this case agree on this definition and on the fact that this is an objective standard requiring analysis of what a person of ordinary prudence would do under the circumstances. (Plaintiff's Brief, p. 41; Defendant's Brief, p. 32.) CT Page 15434
The record indicates that the division, on prior investigations, had uncovered evidence that the plaintiff was conducting business in a manner proscribed by the provisions of CUSA. (Transcript Vol. 3, p. 32; Transcript dated May 12, 2001[9], pp. 146, 152; Transcript Vol. 5, p. 58; Transcript Vol. 12, pp. 87-88.) Therefore, it was logical that the Commissioner would want to conduct subsequent examinations to ensure compliance with CUSA. The Commissioner gave advance notice of the examination although he was not required to do so by the statute. (Ex. K.) The examiners offered to make many concessions in order to enable the examination to go forward on that date, including offering to make their own copies. (Transcript Vol. 9, pp. 126-127; Transcript Vol. 12, pp. 43, 124.) The record contains evidence that after First Providence was informed that its failure to allow access would subject it to possible revocation of its registration and it finally allowed the examiners access, the examiners were delayed and obstructed before they were allowed to move forward with their examination.
This court finds that the Black's Law Dictionary definition of "reasonable" is the definition that is appropriate to apply to the statute. The rules of statutory construction require that, where terms are not defined in the statute, we must construe words according to their common usage. General Statutes § 1-1 (a). It is, therefore, fair, proper and moderate under the circumstances of this case that the examiners should have been granted unfettered access to any and all records of First Providence. By applying for registration in Connecticut, First Providence submitted itself to just this type of unannounced examination. It would certainly have been reasonable under the circumstances for the division to appear unannounced to conduct an examination, particularly considering that substantial evidence showed at that time that First Providence had noncompliance problems in the past. Finally, it was reasonable, though not required, for the examiners to offer to make their own copies and perform other essentially clerical functions in order to facilitate the examination.
Indeed, if the court were to accept the plaintiff's position of this issue, it most certainly would have been unreasonable for the Commissioner, or any other like official from any other state, to conduct any examination of any other broker-dealer anywhere in the United States at any point in the weeks preceding the date of this court's decision, also a period of great turmoil, financial and otherwise resulting from the tragic events of September 11, 2001. The very nature of this examination provision requires that it be used to enable examiners to enter the premises of any firm that has voluntarily submitted itself to the jurisdiction of the Banking Commission by seeking registration to conduct examination to ensure that all statutes and regulations designed to protect the investing public are being complied with. If the CT Page 15435 commissioner were required to give notice or to defer to a firm's determination of a more convenient time for the examination, the effectiveness of these examinations would sharply decline and so would the degree of consumer protection afforded by CUSA.
The court finds that the Commissioner's findings of fact in this regard are supported by substantial evidence. Furthermore, the court concludes that the Commissioner correctly applied the law to these facts. Accordingly the court finds for the Commissioner on this claim of error.
3. Failure to Supervise — Section 36b-31-6f (b)[10] of theRegulations
The Commissioner found that the plaintiff violated § 36b-31-6f (b) of the Regulations of Connecticut State Agencies. The Commissioner made numerous Findings of Fact on the failure to supervise issue (FOF 86-101) and on the related audiotape (F0F 48-77) and script (FOF 78-81) issues. Briefly stated, the Commissioner found that the plaintiff had a supervisory manual, dated June 1999, which was not distributed in its entirety to all employees. (FOF 86-88.) Furthermore, this supervisory manual provided that employees only use approved materials. (FOF 92.) The Commissioner found that the audiotapes revealed that scripts, which had not been approved by the firm's compliance officer as required by the manual, were used by employees. (FOF 78-81, 90, 91, 93.) The supervisory manual requires that all individuals who solicit new customers be registered. (FOF 94.) It also requires that phone calls be conducted in a professional manner, free of abusive language. (FOF 96.) Prior to the issuance of the June 1999 supervisory manual, a January 1999 supervisory manual was provided that required employees to obtain only accurate client information. (FOF 97, 98.) The commissioner further found that certain employees were recorded being abusive to customers and the records that were generated by these employees were false. (FOF 99-101.) For instance, the plaintiff had a minimum net worth or annual income requirement (FOF 53-55.), yet one employee, Thomas Linda, was recorded telling potential customers that he would inflate the figures relative to their financial status in order for them to meet the minimum requirements. (FOF 57-59.) Linda was also recorded engaging in coercive sales methods, actually encouraging reluctant, potential customers to sign documents that the potential customer regarded as false. (FOF 60, 62.) Further, audiotapes indicate that another employee, Joe Kwit, frequently misrepresented his position in the company as a broker, when, in fact, Kwit was merely an account opener. (FOF 69, 71-76.)
The plaintiff attacks the Commissioners finding of a violation of § 36b-31-6f (b) on two grounds. First, the plaintiff claims that evidence regarding Mr. Bucchi constitutes inadmissible hearsay. Second, CT Page 15436 it claims that the commissioner may not use evidence of the audiotapes because he had previously deemed them "not material."[11]
 Evidence Regarding Bucchi; Audiotapes and Scripts
Bucchi did not testify before the hearing officer. Examiner Hornyak testified as to his conversation with Bucchi wherein Bucchi told him that the information on his account statement was false. While it may have been preferable to have Bucchi testify in person, the fact that he did not is not necessarily fatal.
"[A]dministrative tribunals are not strictly bound by the rules of evidence and . . . they may consider evidence which would normally be incompetent in a judicial proceeding, as long as the evidence is reliable and probative." Tomlin v. Personnel Appeal Board, 177 Conn. 344, 348,416 A.2d 1205 (1979). Nevertheless, while "hearings before administrative agencies are not governed by the strict rules of evidence, they must be conducted so as to not violate the fundamental rules of natural justice."Jutkowitz v. Department of Health Services, 220 Conn. 86, 98, 596 A.2d 374
(1991). "[N]ot all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown." (Internal quotation marks omitted.) Id., 97. Finally, there is no specific provision prohibiting hearsay in the UAPA. See General Statutes § 4-178 (1); Labenski v. Goldberg, supra, 33 Conn. App. 733.
Nevertheless, even if this court were to disregard all evidence regarding Bucchi, there remains substantial evidence in the record to uphold the violation of § 36b-31-6f (b) of the Regulations. In fact, as the Commissioner notes, "the conversations on the audiotapes are replete with [similar] instances. . . ." (Citation to record omitted) (Corrected Final Decision, p. 36.) The evidence establishes not only a violation of First Providence's own manual, but also a violation of § 36b-31-6f (b). In the analysis, the Commissioner cites more instances of inappropriate behavior on the part of Linda and Kwit in audiotaped discussions with potential customers. In one instance, Linda attempted to convince a potential customer to invest his entire retirement savings. (Corrected Final Decision, p. 36) (TR. Vol. 6, pp. 127-28; Vol. 7, pp. 122-26; Ex. R.)
In another portion of his Corrected Final Decision, the Commissioner used the audiotapes to analyze a potential violation of General Statutes § 36b-4 (a)(2).[12] Ultimately, the Commissioner found that the statements on the audiotape were not material "within the meaning of Conn. Gen. Stat. § 36b-4 (a)(2)," (Corrected Final Decision, p. 31.), and that the Department failed to meet its burden of proof for a CT Page 15437 violation of General Statutes § 36b-4 (a)(2). Nevertheless, the Commissioner did not find the audiotapes to be not material in general and, therefore, their use in connection with the violation of §36b-31-6f (b) is perfectly permissible.
The court concludes that the findings of fact are supported by substantial evidence in the record. Further, the Commissioner correctly applied the law to these facts. Accordingly, the court finds for the Commissioner on this claim of error.
 VI. CONCLUSION
For all of the foregoing reasons, the appeal from the Department of Banking Commissioner's Corrected Final Decision which finds a violation of General Statutes § 36b-6 (b) is sustained. In all other respects, the court finds for the Commissioner. The matter is remanded to the Commissioner for his reconsideration of fines attributable to the violations upon which the court has found no error.
BY THE COURT
PETER EMMETT WIESE, JUDGE